FILED
United States Court of Appeals
Tenth Circuit

March 20, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

AARON JOEL PULLER,

    Plaintiff – Appellant,

v.

PAUL C. BACA, in his individual
capacity, and in his official capacity as
Detective,

    Defendant – Appellee.

No. 13-1156

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:11-CV-02116-WJM-KMT)**

Elizabeth L. Harris, Law Office of Elizabeth L. Harris, LLC, Denver, Colorado, for the
Appellant.

Marc F. Colin, Bruno, Colin & Lowe, P.C., Denver, Colorado, for the Appellee.

Before **TYMKOVICH**, **EBEL**, and **PHILLIPS**, Circuit Judges.

**PHILLIPS,** Circuit Judge.

    In 2009, Denver Police officers arrested Aaron Puller for his suspected involvement in

a racially motivated attack on a man in downtown Denver. A state district court, without a

hearing, dismissed the charges because it concluded that the affidavit of Detective Paul Baca, the officer who applied for and obtained the arrest warrant, had omitted material information and supplied false information that vitiated probable cause. Puller sought redress and sued Detective Baca under 42 U.S.C. § 1983. The federal district court concluded that qualified immunity shielded Detective Baca from liability and granted him summary judgment. We agree. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

BACKGROUND

In the summer of 2009, Detective Baca—a thirty-year veteran of the Denver Police Department—was investigating a string of about 25 violent robberies and assaults in the Lower Downtown area of Denver. His investigation revealed a pattern: groups of African-American males who were members or associates of various street gangs, targeted, attacked, and robbed intoxicated Caucasian males near closing time of downtown bars. One such attack happened in the early hours of August 23, 2009. A group of African-American men attacked and robbed a Caucasian man who had just left a bar in downtown Denver. The victim told Detective Baca that eight to ten African-American males had confronted him. During the attack, the victim heard a woman yell, "Get that White Boy." J.A. at 50, 66, 116.

Detective Baca investigated this attack. He interviewed several people to learn who had participated in the attack. Detective Baca's efforts first led him to Alawn Smith.

Smith told Baca that he was present at the August 23 attack. Smith told the Detective that "it was everybody's job to point out potential targets." J.A. at 123. Smith then said that the group had left a nightclub planning to assault someone, and after targeting the victim, attacked and robbed him.

Detective Baca later interviewed Keisha Parker. Parker told Detective Baca that she had witnessed six earlier attacks, where two of the victims were Hispanic and four were Caucasian. She said that she saw the group that attacked the victim on August 23, 2009. Parker recounted that she had seen several people "run up on this man, he was talking, and they just started beating him down." J.A. at 136 (Parker Interview, 1:00:43–1:00:51). Parker characterized the incident as an "attack." When Detective Baca pressed Parker for more details, Parker responded, "I ain't gonna lie, I was just a little tipsy, so I really didn't . . . I really wasn't . . . my mind wasn't thinking." J.A. at 136 (Parker Interview, 1:00:57–1:01:05). When Detective Baca showed Parker a picture of Puller, Parker said, "That's Stacks . . . . And I don't know nothing about him other than that day that he came over to my house with all them," referencing the day of the attack. Detective Campbell, another officer who was present at this interview, asked Parker, "And he was a Blood, you said?" Parker responded affirmatively, saying "Um hmm." J.A. at 136 (Parker Interview, 48:23–48:40).

Parker then discussed the events after the attack. She told Detective Baca that one of the assailants gave her a credit card (that she learned was from the victim) to buy various

items at a nearby convenience store. Parker said that she knew that the credit card was from the attack that night, but that she could not remember the name on it or even the first letter of the name. When Parker asked the assailant about the credit card's origin, he told her that the group would "spray [her]" (with gunshots) if she told police. Right after that, Parker said that the assailant told her that, "in a matter of fact, we gonna come with you tonight." J.A. at 136 (Parker Interview, 1:14:20–1:14:45). Afterwards, Parker said that "[the group] came to my house with me." J.A. at 136 (Parker Interview, 1:22:53–1:23:02). She said that this made her "uncomfortable" and that the group refused to leave despite her requests. Parker said that, among others, Puller was with the group that followed her home. She said that Puller (and a couple others) would not leave because "they people is at work." J.A. at 136 (Parker Interview, 1:29:10–1:29:28). Detective Baca later asked Parker, "Did you see [Puller] involved in either of those fights?"[1] Parker softly responded, "Nah, nah, his grandma would kill him." J.A. at 136 (Parker Interview, 1:31:40–1:31:51). But this was not the recollection of an astute observer. By her own account, as mentioned, she recalled being "a little tipsy" and described her mental condition as her "mind wasn't working." J.A. at 136 (Parker Interview, 1:05:30-1:05:45). All things considered, we cannot agree with Puller that Parker "unequivocally denied" Puller's involvement in the attack.

---

[1] Detective Baca also was questioning Parker about another similar incident in addition to the August 23 attack.

Later, Detective Baca and Detective Campbell interviewed Landae Woods-King, an active participant in the August 23 attack. Detective Campbell first showed Woods-King various pictures to find out who Woods-King knew. Next, Detective Campbell showed Woods-King a picture of Puller (who was wearing a red shirt in the picture). Woods-King told the detectives that he did not know who Puller was—that is, he couldn't identify him by name. Then Detectives Campbell and Baca asked Woods-King questions about the August 23 attack. Detective Campbell sorted through the pictures again for Woods-King to say which individuals were (or were not) present on the night of the attack. Woods-King again twice confirmed Puller's presence. First, Detective Campbell showed Puller's picture to Woods-King, who said, "Yep, he was there." J.A. at 138 (Woods-King Interview, pt.2, 1:15–1:18). Detective Campbell then listed all the people Woods-King said were present at the August 23 attack. As he named them, Detective Campbell said, "a guy in a red shirt with a goatee." Woods-King nodded in affirmance. J.A. at 138 (Woods-King Interview, pt.2, 3:44–3:47)**.** Detective Campbell later asked Woods-King, "Who's in this group that's walking up there; approaching this guy? All of these people? Who's in the group that's approaching this guy?" J.A. at 138 (Woods-King Interview, pt.2, 7:00–7:13). In response, Woods-King separated the pictures of various individuals into those who approached and those who did not. Woods-King put Puller's picture with the group of people who had been approaching the victim. Detective Campbell then reviewed the pictures Woods-King separated to confirm who was in the group that approached the

victim. He then said to Woods-King, "So the group that's approaching this guy at this time . . . [lists names], guy in the red shirt, [lists more names]." J.A. at 138 (Woods-King Interview, pt.2, 7:37–7:58). Woods-King confirmed that information with Detective Campbell, adding that there were more people in the group that night than those whose pictures he identified.

Based on all of this information, Detective Baca sought an arrest warrant for Puller. He believed that he had probable cause to arrest Puller for both aggravated robbery and a bias-motivated crime under Colorado state law. Under Colorado law, a person commits a bias-motivated crime:

> If, with the intent to intimidate or harass another person because of that person's actual or perceived race . . . he or she:
>
> (a) Knowingly causes bodily injury to another person; or
>
> (b) By words or conduct, knowingly places another person in fear of imminent lawless action directed at that person or that person's property and such words or conduct are likely to produce bodily injury to that person or damage to that person's property. . . .

Colo. Rev. Stat. § 18-9-121 (2014).

Detective Baca included this statutory language in his application for the arrest warrant. He described his investigation into the string of violent assaults and robberies in downtown Denver. He explained his reasons for suspecting that African-American gang members were targeting Caucasian victims in Lower Downtown Denver late at night. He then outlined how he had determined that Puller was involved in the August 23 attack. He

started with the information he gained from Smith, who told Detective Baca that the group had left the club looking for someone to attack. Detective Baca then stated that Woods-King had first said that he was with a group of people, including Puller, on August 23. Detective Baca then included the following statement:

> Mr. WOODS-KING related that as his group walked in the area of 17th Street and Larimer Street, Mr. CAMACK began "talking stuff to the dude" and "then just took off on him." Mr. WOODS-KING stated that Mr. Rasheed TURNER, Mr. Rashad TURNER, Mr. THOMAS, Mr. PENNY, Mr. PATTON, Mr. PULLER, Mr. FORD, and Mr. FRANCIS all took part in the initial attack on the victim.

J.A. at 126.

But Detective Baca did not mention that Woods-King could not identify Puller by name or that Parker had responded to Detective Baca's question about whether Puller was "involved in the fight" by saying "nah, nah, his grandma would kill him." J.A. at 136 (Parker Interview, 1:31:40–1:31:51). At the same time, Detective Baca also did not include Parker's statement at the interview that she was "a little tipsy" and "[her] mind wasn't thinking." J.A. at 136 (Parker Interview, 1:00:57–1:01:05). However, Detective Baca did include other information Parker provided: that she used the victim's credit card; that one of the individuals in the group then told her about the attack; that she told that person she would tell the police everything if caught using the card; that group members threatened to shoot her if she talked to the police about using the credit card; and that the group, including Puller, caught up to her at the bus stop, and then followed her to her home uninvited.

- 7 -

A state court issued the arrest warrant, and Denver Police officers arrested Puller in November 2009. After watching the interview tapes, Puller's attorney moved to dismiss the charges, relying on *Franks v. Delaware*, 438 U.S. 154 (1978). Without a hearing, the state district court dismissed the charges. It concluded that, based on Parker's statements supposedly disavowing Puller's involvement, there was not probable cause to arrest Puller. The state district court ignored Woods-King's identifying Puller (by his picture) as being among those who approached the victim, and, in fact, wrongly stated that "Woods-King claimed that he did not recognize [Puller] . . . ." J.A. at 134–35. As we have noted, Woods-King told Detectives Baca and Campbell that Puller (the "guy in the red shirt") was among those who approached the victim.

After the state court dismissed the charges, Puller sued Baca under 42 U.S.C. § 1983, asserting claims for false arrest, malicious prosecution, and manufacture of inculpatory evidence. Puller also alleged violations of equal protection and substantive due process.[2] Detective Baca moved for summary judgment, asserting that qualified immunity shielded him from liability.

The district court agreed with Detective Baca and granted him summary judgment. It concluded that "a reasonably prudent police officer faced with this evidence could find a substantial probability that Plaintiff committed a Bias-Motivated Crime." J.A. at 107. The district court noted the history of race-based attacks over that summer in Lower

---

[2] Puller initially sued Detective Baca in state court, but Baca removed the case to federal district court.

Downtown Denver, and Puller's having "'approached'" the victim with a group where one member "shouted 'Get that white boy' during the attack." J.A. at 107–08. Based on that history and the facts of the attack, the district court concluded that:

> A reasonable person could find that [Puller's] presence with the group establishes a substantial probability that he "knowingly place[d] another person in fear of imminent lawless action directed at that person or that person's property" that was "likely to produce bodily injury to that person or damage to that person's property."

J.A. at 108; *see* Colo. Rev. Stat. § 18-9-121(2)(b).

The district court found it "reasonable for [Baca] to believe that probable cause existed for [Puller's] arrest."[3] J.A. at 108. Applying *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996), and its procedure for how courts should address potentially defective warrants, the district court set aside what it considered false information and included what it considered to be omitted material information in the arrest warrant. Based on what it added and subtracted, the district court still concluded that "a reasonably prudent police officer faced with this evidence could find a substantial probability that [Puller] committed a Bias-Motivated Crime." J.A. at 107. The district court granted qualified immunity to Baca against all of Puller's claims. Puller timely appealed.

## DISCUSSION

---

[3] The federal district court concluded that there was not probable cause for Baca to arrest Puller for aggravated robbery because "[n]one of the evidence presented supports a reasonable finding that [Puller] took anything of value from the victim, let alone that he 'wound[ed]', 'str[uck]', or used any deadly weapon against the victim.'" Colo. Rev. Stat. § 18-4-302 (2014). J.A. at 107.

We review de novo a grant of summary judgment on the basis of qualified immunity. *Harman v. Pollock*, 446 F.3d 1069, 1077 (10th Cir. 2006). "We review the evidence in the light most favorable to the nonmoving party." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc). "Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Id.* at 1114 (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)). When a defendant asserts qualified immunity, as Detective Baca does here, the burden shifts to the plaintiff to establish (1) a violation of a constitutional right (2) that was clearly established. *Id.* This is a "heavy, two-part burden" that the plaintiff must meet. *Medina*, 252 F.3d at 1128 (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). Failure on either element is fatal to the plaintiff's claims. *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011). The plaintiff bears this heavy burden because we presume that law enforcement officers "are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs." *Id.*

When a plaintiff meets this heavy burden, the burden shifts back to the defendant to prove that there are no genuine disputes of material fact and that he is entitled to judgment as a matter of law. *Medina*, 252 F.3d at 1128. Ultimately, "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendant[] is entitled to qualified immunity." *Id.*

In his complaint, Puller asserts that Baca violated his constitutional rights by arresting him without probable cause and with a racially motivated intent. He also alleges that Baca manufactured inculpatory evidence to support that arrest, maliciously prosecuted him, and imprisoned him in violation of his right to substantive due process. Most of Puller's claims (except his equal protection claim) require us to consider whether Baca had probable cause to arrest Puller. *See, e.g.*, *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (requiring a lack of probable cause to support a malicious prosecution claim); *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (considering probable cause in a false arrest claim).

The district court concluded that Detective Baca did not have probable cause to arrest Puller for aggravated robbery. Thus, it focused most of its efforts on examining probable cause for a bias-motivated crime. In Colorado, persons commit a bias-motivated crime if, with the intent to intimidate or harass a person because of race, they "[b]y words or *conduct*, knowingly place[] another person in fear of imminent lawless action directed at that person or that person's property and such words or conduct are likely to produce bodily injury to that person or damage to that person's property . . . ." Colo. Rev. Stat. § 18-9-121(2)(b) (emphasis added).

Affiants seeking arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate

- 11 -

probable cause. *Wolford*, 78 F.3d at 489. In such a situation, we measure probable cause by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause for the warrant. *See id.*

We begin by removing any false information. Puller argues that Detective Baca "falsified the affidavit" when he stated that Puller "took part in an initial attack." Appellant's Br. at 32; J.A. at 126. The district court agreed and concluded that Detective Baca's statement that Woods-King "stated" that Puller "took part in the initial attack" was false. J.A. at 106. Baca's use of "took part in an initial attack" instead of "approached" illustrates the limits of language. We gather that the district court equated "took part in an initial attack" to mean physically striking the victim. Instead, we understand that phrase could reasonably mean being part of the mob that collectively attacked the victim, where each person's presence furthered the attack event. But regardless of whether Baca went too far with the language he used, the federal district court found Puller's "approach" sufficient to establish probable cause for a bias-motivated crime under Colo. Rev. Stat. § 18-9-121(2)(b). As we discuss later, we agree that Puller's "approach" was sufficient for probable cause.

Next, we consider any omitted material information. Puller asserts that Detective Baca intentionally omitted Parker's ambiguous statement denying that Puller was involved in the fight. We are uncertain why Detective Baca did not include this statement

in his affidavit when he included some of the other information Parker provided. But based on the record, we believe that the omission was, at worst, negligent. Except for conclusory allegations, Puller does nothing to convince us that Detective Baca intentionally or recklessly omitted the statement. *See Taylor v. Meacham*, 82 F.3d 1556, 1563 (10th Cir. 1996) (concluding that an officer did not violate the Fourth Amendment because the plaintiff failed to provide any evidence showing or suggesting that the officer omitted any facts knowingly or with reckless disregard for the truth).

Further, Parker's statement is not an unequivocal denial of Puller's presence. When she says "nah, nah, his grandma would kill him," she seems to be surmising rather than giving a definitive answer about Puller's involvement. Even if Parker had unequivocally stated that Puller was not involved in the "fight," that would not undermine Woods-King's statement that Puller had been part of the group that approached the victim. And we must remember that the victim told police that his attack came after eight to ten African-American males confronted him.

With that, we summarize the other information contained in Detective Baca's arrest affidavit. First, there was an ongoing string of race-based violent assaults and robberies—approximately 25—in Lower Downtown Denver in the summer of 2009. The attackers were consistently identified as African-American gang members. The attackers targeted Caucasians. One such attack happened on August 23, 2009.

Next, Detective Baca interviewed the victim. The victim told Detective Baca that he was walking alone to his car when a group of people approached him, and one person said something to him. After this, multiple people attacked him, and a female in the group yelled, "Get that white boy." J.A. at 107–08, 116.

Detective Baca then interviewed Alawn Smith. Smith told Detective Baca that when he and the group left the nightclub, they were planning to attack and rob someone and were scoping out potential targets. Smith told Detective Baca that the group had targeted the victim on August 23.

Next, Detective Baca interviewed Keisha Parker. She responded to Detective Baca's question about whether she saw Puller involved in the fight by saying softly, "Nah, nah, his grandma would kill him." But Parker also told Detective Baca that she only saw part of the attack and that she was "a little tipsy" and "[her] mind wasn't thinking." Parker also admitted to using the victim's credit card after the attack to buy various items for at least a couple of the attackers. Parker also said that, after one of the assailants threatened her if she went to the police, the group—including Puller—followed her onto the bus and then to her home after the attack.

Finally, Detective Baca gained valuable information from Landae Woods-King. Woods-King identified Puller as part of the group that was present at the attack. Woods-King then identified Puller as someone who had approached the victim right before the attack.

In his arrest warrant affidavit, Detective Baca did not include Parker's statement that she believed that Puller would not have participated because he would be concerned about his grandma's reaction. Conversely, Detective Baca also did not include Parker's statements suggesting that she was inebriated and not paying close attention that night. And he assumed that all who approached the victim "took part in the initial attack on the victim." J.A. at 126.

We agree with the district court that Detective Baca's affidavit (even as modified) gave probable cause that Puller had committed a bias-motivated crime in violation of Colo. Rev. Stat. § 18-9-121(2)(b). Puller's conduct—along with everyone else's in that group—placed the victim in fear of imminent lawless action and helped produce bodily injury. No one contends that Puller actually hit the victim. But Puller was a member of a group of people who together approached a lone victim, and members of that group physically assaulted and robbed the victim. As the group approached, a female yelled, "Get that white boy," demonstrating the group's race-based intent—one similar to other recent attacks in that area where the attackers' race was different from the victims' race.

This information indicated that Puller knowingly helped place another person in fear of imminent lawless action directed at that person, and that such action was likely to produce bodily injury to that person. *See Kerns*, 663 F.3d at 1188 (considering whether there is a "substantial probability"—something "more than a bare suspicion"—that the suspect committed the crime). As the district court noted, Puller's role as "a member of a

group of some ten people approaching the lone victim . . . was a role of intimidation, with race-based intent, that presaged and facilitated the subsequent attack and robbery." J.A. at 108. Simply put, Puller's presence could have shielded passers-by from seeing the attack and discouraged them from interceding on the victim's behalf.

Puller argues that he did not engage in words or conduct that placed another person in fear. We disagree. Smith told Detective Baca that a group left the nightclub searching for a victim. Woods-King admitted that Puller was part of that group on August 23, and that he, Puller, and others approached the victim. This information shows that Puller was not merely present, but that, by approaching the victim as part of the group, Puller acted affirmatively to help initiate and sustain the attack on the victim. *Approach Definition*, Oxford English Dictionary Online, http://www.oed.com/view/Entry/9837 (last visited Jan. 13, 2015) (defining "approach" as "the act of coming nearer (relatively), or of drawing near (absolutely) in space").

Puller also argues that probable cause could not exist because "the mere act of being part of a group" does not establish probable cause. Appellant's Br. at 26. Puller cites several cases where courts rejected finding probable cause because the person had a "mere propinquity" or "association" with others "independently suspected of criminal activity." *See, e.g.*, *United States v. Dozal*, 173 F.3d 787, 792 (10th Cir. 1999) ("Association with persons suspected of criminal conduct or nearness to the site of illegal activity does not alone suffice [to establish probable cause for arrest]."); *Vazquez-Pulido*,

155 F.3d at 1216 ("[M]ere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause.") (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)) (internal quotation marks omitted).

Indeed, Puller was associated with Woods-King and other members of the group. But there was more. As mentioned, Smith told Detective Baca that the group left a nightclub searching for a victim to attack. During the attack, Puller was not just a stationary object in a law-abiding group; he, with others, approached the sole victim based on his race, and the group then attacked and robbed him. After the attack, Parker told Detective Baca that the group—including Puller—followed her to her home and stayed there for at least a few hours.

Similarly, Puller says that his mere presence in the group does not give rise to probable cause that he committed a bias-motivated crime. To support his proposition, he points to *United States v. Summers*, 414 F.3d 1287, 1296 (10th Cir. 2005). Because *Summers* addressed whether association was sufficient for a conviction, not probable cause, it provides little guidance here. *Id.* (concluding that mere presence with co-defendants was insufficient to support a conspiracy conviction).

To establish probable cause that Puller committed a crime, Detective Baca's arrest warrant, as modified, did not have to establish proof beyond a reasonable doubt, nor did it have to establish that Puller's guilt was "more likely true than false." *Kerns*, 663 F.3d at 1188 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)) (internal quotation marks

omitted); *see also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (stating that probable cause "is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances" and that the substance of probable cause is "a reasonable ground for belief of guilt"). Rather, the affidavit needed only to establish something "more than a bare suspicion" that Puller committed a bias-motivated crime. *United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011) (quoting *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999)) (internal quotation marks omitted).

Even after including Parker's information that Puller did not participate in the fight (which reasonably could mean that he did not do the actual physical fighting), and after substituting Wood-King's statement that Puller "approached" the victim rather than "took part in the initial attack" we conclude that the modified affidavit provided sufficient information to establish probable cause for Puller's arrest. Because even the modified affidavit establishes probable cause, Puller cannot establish a constitutional violation on his false arrest, malicious prosecution, and substantive due process claims. *See Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which [the officer] had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested.") (quoting *United States v. Alonso*, 790 F.2d

1489, 1496 (10th Cir. 1986)); *see also Romero*, 45 F.3d at 1476 (false arrest); *Wilkins*, 528 F.3d at 799 (malicious prosecution); *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) (substantive due process). Accordingly, Puller is entitled to qualified immunity on all Puller's claims depending on a lack of probable cause.

Finally, as the district court concluded, Puller also has not shown a violation of the Equal Protection Clause. He does not address this argument in his brief, let alone show that Baca had a discriminatory intent or purpose to arrest Puller. *See Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir. 1996) (holding a district court properly dismissed an equal protection claim because it did not find that the governmental entity intentionally discriminated against the plaintiffs). The district court correctly granted summary judgment to Detective Baca on this claim as well.

## CONCLUSION

Because the district court correctly granted qualified immunity to Detective Baca, we AFFIRM the district court's grant of summary judgment in Detective Baca's favor.