**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 20, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JIMMIE DARYL MOSES,

Defendant-Appellant.

No. 19-6036

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:15-CR-00041-F-1)**

---

Josh Lee, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Appellant.

Steven W. Creager, Assistant United States Attorney (Timothy J. Downing, United States Attorney, and Ashley L. Altshuler, Assistant United States Attorney, with him on the brief), Office of the United States Attorney, Oklahoma City, Oklahoma, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MATHESON**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

Jimmie Daryl Moses pleaded guilty to a federal firearm charge after the district court denied his motion to suppress evidence uncovered in a search conducted on his property in Norman, Oklahoma. The search was intended to uncover evidence of an illegal automobile "chop shop" operation, but law enforcement also found a firearm that Moses should not have possessed as a former felon.

Moses reserved the right to challenge the suppression order and argues on appeal that the district court impermissibly denied him an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the search warrant. He specifically contends Norman police recklessly neglected to tell the state judge issuing the warrant that the police had materially exculpatory evidence in the form of video footage of his property. We agree with the district court that the video footage was not materially exculpatory and does not negate the strong probable cause established by the affidavit submitted to the state judge.

Therefore, exercising our jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's order denying a *Franks* hearing.

## I. Background

In October 2012, the Norman Police Department began investigating vehicle thefts happening across Norman, Oklahoma. During this investigation, one of the officers, Detective Barbour, uncovered evidence suggesting Moses was

operating at his residence in rural Norman a "chop shop"—or a place where stolen cars are taken to be "chopped" up and sold for parts. Detective Barbour, after interviewing at least five informants and inspecting aerial photographs of Moses's property, came to believe that stolen vehicles were being taken to the property, sold to Moses in exchange for methamphetamine, stripped for parts, scrubbed of their vehicle identification (or VIN) numbers, and then resold in Oklahoma City through organized crime channels. To help confirm the detective's suspicions, the Police Department arranged for a video camera to be installed on a pole near the property in April 2013. The camera had a view of the driveway, part of the main house, and two other buildings on the property. The video feed from the camera was apparently not monitored until June 11, at which time the investigators agreed on a plan by which they would review a list of vehicles reported stolen and "check the video feed every 3-4 days" for any of the vehicles on the list. R., Vol. 1 at 100. A few days later, on June 17, Norman Police received a tip that Moses suspected the camera was there and spying on his property.

During the course of the investigation, the police interviewed a number of informants. The informants all told stories consistent with the theory that Moses was running a chop shop on his property. One told Detective Barbour that two people were "getting their drugs from a guy named 'Daryl' last name unknown

[who] was busted for a chop shop on north Porter some time ago." R., Vol. 1 at 89. The informant also told police that one of those people "takes the stolen vehicles to 'Daryl' to have them stripped down." *Id*. While the informant did not know Daryl's last name, he did know that Daryl had "a white tow truck with no marking on it" and that he was getting methamphetamine from a person associated with the Mexican Cartel. *Id*.

Another informant told Detective Barbour that stolen vehicles were being taken to a property "east of Norman" to be "chopped up" so that their parts could be "taken to Oklahoma City." *Id*. at 91. While this informant did not know the property owner's name, he described a man matching Moses's appearance and described a property matching the aerial photographs.

A third informant told Detective Barbour that cars were taken to a property in the vicinity of Moses's, where they would wait "until it cools off." *Id*. A fourth told police that a man brought stolen cars to Daryl's property in the part of town where Moses lived in exchange for methamphetamine. The same informant also said there was "a shop or barn where Daryl normally works on the vehicles." *Id*.

A final informant told police he had taken stolen cars to Daryl's property and stated: "Daryl gets the cars, turns them over by stripping the vehicle, destroying the [VIN], and then getting rid of the rest of the vehicle." *Id*. at 92.

He also said they would drive stolen vehicles to a brown building on the property, get their meth, and then bring the vehicles to the shop on the property.

To the extent that the informants described the site of the exchange of cars for meth and the owner of that site, their descriptions all match the property and Moses, respectively. The aerial photographs that Detective Barbour attached to his affidavit confirm the existence of various structures referred to by the informants, and they also showed approximately 20 vehicles on the property—including a truck that might be an unmarked white tow truck and some vehicles that were apparently not in use, as demonstrated by the way they were parked. Based on his training and experience, the detective averred that the photographs showed what one would expect to see if "an active chop shop [existed] on the property." *Id*.

The affidavit included no mention of the pole camera or the fact that its footage yielded nothing suspicious.[1]

---

[1] Because the pole camera footage was only stored on a month-to-month basis, it was not preserved long enough for the district court to review it. We therefore must rely on police officers' testimony as to what was on the footage. According to an investigator's sworn affidavit, Detective Ware said that "in the five months the camera was up and running and prior to the execution of the search warrant he never saw a vehicle on Mr. Moses's property that had been reported stolen." R., Vol. 1 at 103. Unsurprisingly, then, Detective Barbour did not rely on that pole camera footage when he sought a search warrant for the property. Instead his 14-page search affidavit discussed his interviews with various informants and contained aerial photographs of the property.

A state judge issued the warrant, and Norman police executed it on September 4, 2013. During their search, officers discovered a stolen pistol on Moses's person, several stolen vehicles, parts of stolen vehicles, license plates from stolen vehicles, and other items one might expect to find at a chop shop. They also found 26.15 grams of methamphetamine and stolen firearms in Moses's bedroom. *Id*.

Moses was arrested and indicted with being a felon in possession of a firearm, a federal crime under 18 U.S.C. § 922(g)(1). Moses moved to suppress evidence uncovered during the search. He argued that pole camera footage vitiated probable cause and that Detective Barbour's exclusion of material evidence from the warrant affidavit was reckless, in violation of Moses's Fourth Amendment rights. He further argued that he was entitled to a *Franks* hearing because he made a substantial preliminary showing of Detective Barbour's recklessness and the video footage's materiality.

The district court denied his motion to suppress and declined to grant Moses an evidentiary hearing. The court reasoned that any pole camera footage would have been insufficient to negate the strong probable cause that resulted from the cross-corroborated testimony of five witnesses and the aerial photographs. The district court observed the absence of suspicious activity on the camera was not all that concerning. After all, it noted, stolen vehicles were

brought onto the property at night, when the camera would not have been able to see any criminal activity.

## II. Analysis

Moses contends on appeal he was entitled to an evidentiary hearing to establish that the police recklessly omitted material exculpatory evidence as required by *Franks*. As in the district court, he argues the pole camera footage that showed no sign of criminal activity would have defeated probable cause, making its omission from a search warrant application improper.

### *A*. Franks v. Delaware

Under *Franks*, a Fourth Amendment violation occurs if "(1) an officer's affidavit supporting a search warrant application contains a reckless misstatement or omission that (2) is material because, but for it, the warrant could not have lawfully issued." *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015); *see also Kapinski v. City of Albuquerque*, (No. 19-2149, 2020 WL 3635094, at 9–10 (10th Cir. July 6, 2020). Thus in order to obtain any sort of relief under *Franks*, a defendant must show both recklessness and materiality.

If a defendant makes a "substantial preliminary showing" that both of these elements exist, he is entitled to an evidentiary hearing to prove a *Franks* violation. *Franks*, 438 U.S. at 155. Such a substantial preliminary showing requires more than mere allegations of defects in a warrant. A defendant must

produce evidence of the complained-of defects by offering "[a]ffidavits or sworn or otherwise reliable statements of witnesses." *Id*. at 171. If the defendant cannot produce such evidence, he must explain why he cannot do so. *Id*.

In considering whether a *Franks* hearing was appropriate, the district court determined that Moses failed to make any substantial preliminary showing that the pole camera footage was material. To the contrary, the absence of any suspicious activity on camera is to be expected, according to the district court, if the criminal activity happened at night when the camera could not see it. That Moses also knew about the camera further suggests the camera would not be expected to yield anything suspicious, as he would have taken extra measures to avoid doing anything criminal in its field of vision.

Because the district court, and now the parties, focused almost exclusively on the materiality prong, we consider that prong first. And because we conclude the district court came to the correct decision on this prong, any consideration of the recklessness prong is unnecessary since the failure to show either materiality or recklessness is fatal to a defendant's entitlement to a *Franks* hearing.

**B. Application**

**1. Evidentiary Standard**

We begin by describing the proper standard for the district court to use when deciding to grant or deny a *Franks* hearing. Moses argues that a district

court is required to draw all reasonable inferences in favor of the movant and objects to the fact the district court did not draw such inferences. Specifically, he argues the district court was required as a matter of law to accept every step of a lengthy and unsubstantiated inferential chain. The first inference he says was required is that the police installed the pole camera and reviewed the footage in good faith. The district court would then be required to draw the inference that "the surveillance camera" installed and monitored in good faith by competent police "would have captured some indication that a chop shop was in operation on Mr. Moses's property if such activity were, in fact, occurring." Aplt. Br. at 26. He further argues the district court should have inferred from the fact the police did not include any evidence in their warrant affidavit that they "failed to capture *any* suggestion of *any* kind that Moses was operating a chop shop." *Id.* at 27 (emphasis in the original). This all builds up to the ultimate link in the chain that Moses "could not operate a chop shop for five months without leaving behind some visual evidence of such an operation" on the pole camera. *Id*. In short, Moses argues the district court was required to infer materiality of the omitted evidence.

As an initial matter, we disagree with Moses's premise that the district court was required to draw inferences supporting his theory of the case. Instead, our cases make clear a district court is not required to draw all logically

permissible inferences favorable to a defendant seeking a *Franks* hearing.  We made this point most forcefully only recently when we held: "A reviewing judge may infer recklessness . . . .  But this is not a mandatory or automatic inference." *Kapinski*, 2020 WL 3635094, at 17 (citing *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).  And in *United States v. Williams*, we concluded a police affiant's past misconduct did not "allow us to infer that a false statement was deliberately or recklessly included" in a warrant affidavit.  576 F.3d 1149, 1162 (10th Cir. 2009).  Of course, in light of the fact *Franks* requires a *substantial* showing of recklessness, it makes little sense for a court to draw an *unsubstantiated* inference of recklessness.  *See Kapinski*, 2020 WL 3635094, at 17 (concluding an inference of recklessness requires confirmation and would be improper where "the record lacks direct evidence of . . . recklessness and fails to support any such inference").  And the principle is at least as compelling when considering the materiality prong, as we do here.  The law cannot require a substantial showing of materiality at the same time as it forces a district court to simply infer it.

A district court reviewing the probable cause for a warrant puts itself in the shoes of the warrant's issuing jurist and gives substantial deference to the prior decision.  *See Illinois v. Gates*, 462 U.S. 213, 236 (1983) ("A magistrate's 'determination of probable cause should be paid great deference by reviewing

courts.'") (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The district court is, therefore, only required to make any inferences that would have been required when the warrant application was considered. As it turns out, a court assessing probable cause based on the totality of the evidence in a warrant application is rarely ever compelled to draw any particular inference. Because the assessment of probable cause "does not lend itself to a prescribed set of rules," *id.* at 239, a judge is free to draw, "or to refuse to draw," any "reasonable inferences as he will from the material supplied to him." *Id.* at 240. Moses's understanding of the district court's role is incompatible with this scheme and our case law.

In support of his argument to the contrary, Moses suggests that he was entitled to summary-judgment-like inferences in his favor, citing only a case discussing the summary judgment standard. *See Pioneer Centres Holding v. Aleurs Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (stating that a "district court must draw all reasonable inferences in favor of the nonmoving party" on a motion for summary judgment). He contends the denial of a motion to suppress effectively killed his case and amounted to the equivalent of summary judgment against him. But we are aware of no persuasive authority suggesting that borrowing the summary judgment standard is appropriate in the context of a *Franks* motion, and we decline to adopt it.

Pointing to a Seventh Circuit case, Moses also contends the district court is required to take any permissible inference in favor of the defendant into account, even if that court decided the inference was inappropriate. But in that case, *United States v. Clark*, the court concluded "credibility omissions do not *require* courts to infer recklessness" and "the omission of so much important [material] information *permits* (but does not require) an inference that the omissions were deliberate or reckless." 935 F.3d 558, 566 (7th Cir. 2019) (emphasis in the original); *see also Kapinski*, 2020 WL 3635094, at 17.

To be fair, Moses specifically cites one line in *Clark*: "If the showing of probable cause in the warrant application depended on the credibility of the informant, that permissible inference should be enough to obtain a *Franks* hearing." 935 F.3d at 566. We take his argument to be that, because a "permissible inference should be enough to obtain a *Franks* hearing," any plausible inference in favor of a *Franks* hearing necessitates one. Such a reading, though, misunderstands the Seventh Circuit's point. We read that case to say that *when a permissible inference is actually drawn*, it may necessitate a *Franks* hearing. To require a court to grant a *Franks* hearing just because some inference is permissible collapses the distinction between required and permissible inferences and ignores the general principles that the Supreme Court has set out

for reviewing probable cause determinations. *See* 462 U.S. at 236. We reject any argument that has us read *Clark* otherwise.

In short, our cases hold that unsubstantiated inferences are not "mandatory or automatic" in the *Franks* context. *Kapinski*, 2020 WL 3635094, at 17; *United States v. Hopson*, 643 F. App'x 694, 697 (10th Cir. 2016) (affirming the district court's refusal to draw inference in defendant's favor when a logical alternative explanation existed). We therefore reject Moses's proposed evidentiary standard and proceed to consider whether the omission of information regarding the pole camera was material to the state court's issuance of a search warrant by considering the totality of the evidence.

### 2. *Materiality*

In examining whether the excluded information would have been material, we consider whether the affidavit, had it included the omitted information, still would have supported probable cause and thereby justified a warrant. *Herrera*, 782 F.3d at 575. Or, put another way, we ask whether the inclusion of the video footage in the affidavit would negate the existence of probable cause in support of the search warrant. *See Kapinski*, 2020 WL 3635094, at 11; *Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015).

An affidavit supports probable cause for a search warrant "if the totality of the information it contains establishes the fair probability that contraband or

evidence of a crime will be found in a particular place." *Hopson*, 643 F. App'x at 696. Like the district court, we conclude the affidavit established probable cause and the footage would not have negated it, making the omission of the footage immaterial.

We begin by noting Moses conceded at oral argument that the search warrant affidavit established probable cause and only argues the pole camera footage negates that probable cause. Before we proceed to considering the materiality of the footage, though, it is worth remembering just how strong was the probable cause established by the affidavit.

As described above, cross-corroborating informant testimony and aerial photographs established very strong probable cause to believe that Moses was operating a chop shop. Several informants described a criminal scheme in which a man named Daryl accepted stolen vehicles in exchange for methamphetamine at a property with multiple structures. According to informant testimony, Daryl was a white, gray-haired man in his late fifties. Moses and his property match the descriptions. Moses, whose middle name is Daryl, was white, gray-haired, male, and in his late fifties, and he lived on the road named by informants. Aerial photographs of his property show multiple structures—making it seem likely that the informants were talking about Moses's property. And while there is no brown structure on the property matching the testimony of one of the informants, there is

-14-

a brown structure on an adjacent property that, according to the affiant, might have been accessed by Moses per local custom. The photographs also show many vehicles. Among those vehicles is a white truck that arguably looks like the unmarked, white tow truck an informant said "Daryl" owned. And some of the vehicles on the property were clearly in disuse—making it all the more probable that there was a chop shop being run on the property.

Moses's materiality argument centers on the notion that a lack of suspicious video evidence fatally undercuts any reason to search the property. We do not agree. According to Detective Ware's statements to an investigator, the pole camera never caught sight of any vehicles matching the descriptions of ones reported stolen. It is safe to say, then, that the footage certainly would not have added to probable cause. Moses argues the footage would have detracted from probable cause, and so much so that it would make a warrant-issuing court reject the otherwise strong probable cause established by testimonial and photographic evidence. We simply are not persuaded that the lack of suspicious activity on video undermines that probable cause—let alone fatally.

As the district court noted, it is perfectly logical that the camera would not have caught sight of anything suspicious. Detective Barbour told the state judge that all the relevant criminal activity was happening at night. The camera may well not have been able to pick up anything suspicious at night, even if such

activity were occurring. Moses counters this point by noting that there is a flood light on the property, visible in the aerial photographs, that would have illuminated the property at night when criminal activity was supposed to have occurred. Moses presents no evidence, though, that the flood light would have been turned on all night or would have illuminated the part of the property being surveilled with the pole camera. We also note that Moses likely suspected the camera was there as early as the sixth day of monitoring—meaning he could have avoided doing anything suspicious in view of the camera for almost the entire time the feed was monitored.

Given the context, the district court was correct to decide that criminal activity would not necessarily have been captured by the camera. We therefore conclude that the pole camera footage—and the fact that it did not show any criminal activity—would not have negated probable cause if it were included in the search warrant affidavit.

## III. Conclusion

Because we conclude any omitted evidence of pole camera footage was not materially exculpatory and did not negate probable cause established by other evidence in the search warrant application, the district court did not err in denying Moses's request for a *Franks* hearing on his motion to suppress evidence. We accordingly AFFIRM the district court.