24 F.3d 110
 Herschel BEARD, III and Carol Goslin, Plaintiffs-Appellants,
v.
The CITY OF NORTHGLENN, COLORADO, a municipal corporation;
the City of Westminster, Colorado, a municipal corporation;
Greg S. Neal, individually; and Stephen Hipp, individually;
Defendants-Appellees.
 No. 93-1068.
 United States Court of Appeals,
Tenth Circuit.
 May 11, 1994.
 
 Michael F. Berger (Guy B. Humphries with him on the brief), of Waldbaum, Corn, Koff and Berger, P.C., Denver, CO, for appellants.
 Christina M. Habas of Watson, Nathan & Bremer, P.C., Denver, CO, for appellees Westminster and Neal.
 Theodore S. Halaby (Robert M. Liechty and Joseph M. Timmins, with him on the brief), of Halaby, McCrea & Cross, Denver, CO, for appellees Northglenn and Hipp.
 Before WHITE, Associate Justice (Ret.);* LOGAN, and EBEL, Circuit Judges.
 
 
 1
 WHITE, Associate Justice (Retired).
 
 
 2
 Appellant Herschel Beard, III, was the innocent victim of an extraordinary case of mistaken identity. Misled by a complex fraud into thinking Beard responsible for at least a pair of crimes within their jurisdictions, Detectives Greg Neal and Stephen Hipp, appellees here, sought, received, and executed a warrant for his arrest. Once the detectives discovered their mistake and appellant's innocence, all criminal charges against Beard were dismissed. This civil suit followed, with appellant seeking damages from appellees under 42 U.S.C. Sec. 1983 for what he contended was a violation of his Fourth Amendment right to be free from an unlawful seizure; appellant also filed a state tort action asserting malicious prosecution. The District Court entered summary judgment in favor of appellees on both claims. We now affirm that decision.
 
 
 3
 * Seeking employment as a pilot or flight officer, appellant happened across, and decided to respond to, a "help wanted" advertisement in a trade journal. The soliciting company, ISB Systems, seemed quite interested in his inquiry, promised him an interview, and instructed him to forward his aviation credentials as part of the application process. Appellant sent in his credentials as instructed, but when he received no response from the company and was unable to retrieve his credentials despite attempts to do so, he became concerned that someone had solicited the documents from him for illegal use. He notified the Federal Bureau of Investigation and the Federal Aviation Administration; that was the last appellant knew or heard of his flight credentials until he was arrested nearly a year later.
 
 
 4
 Unknown to appellant, someone had indeed employed his credentials--along with the credentials of Jeffrey Beck, another pilot who responded to the ISB advertisement--in an intricate check kiting scheme. Using Beard and Beck's names to set up a variety of bank accounts in Colorado, the individual, whose identity is still unknown, proceeded to issue checks between the accounts, creating artificially high balances in some of them.[1] Then, posing as Jeffrey Beck, he used these balances to write checks on an account bearing Beck's name in order to purchase office equipment from M & L Business Machines, Inc. ("M & L") and a new car from O'Meara Ford Center, Inc. ("O'Meara"). Both checks, of course, were ultimately returned for insufficient funds.
 
 
 5
 Police investigations of the M & L and O'Meara crimes began independently since the two entities are located in separate Colorado cities. After being informed by the M & L company manager about the bad Beck check it had received, Detective Neal of the Westminster police department contacted the bank on which the check was drawn, the First National Bank of Westminster. An employee there informed Neal that a large check purporting to be drawn on an account bearing Beard's name had been deposited in the Beck account but was itself later returned for insufficient funds.
 
 
 6
 At this juncture Neal began suspecting that Beard had purchased the M & L equipment and manipulated the bank account balances; it did appear, after all, that a check drawn on a "Beard" account was responsible for the misleadingly high balance in the Beck account used in the M & L fraud. After apparently discovering that appellant had resided in Alaska for a time, Neal contacted authorities there and was able to obtain a copy of appellant's actual driver's license; all parties agree that the photograph and signature on the license are indeed Beard's. Neal then prepared a photographic lineup, one that included appellant's driver's license and was not, the parties again agree, in any way unduly suggestive. Neal showed the lineup to Ernest Ledvina, an M & L employee, who tentatively identified appellant as the man who purchased the office equipment from him--this despite the fact that Beard, of course, had nothing to do with the crime.
 
 
 7
 While Neal was pressing his M & L investigation in Westminster, Officer Hipp was focusing on a crime at the Northglenn O'Meara dealership. Someone identifying himself as Jeffrey Beck visited the car dealership, completed a retail installment contract, presented a $1,000 counter check, and was permitted to drive off in a new car. When the $1,000 counter check was returned for insufficient funds, the O'Meara salesman, Robert Law, contacted Detective Hipp of the Northglenn police. Hipp managed to locate the true Jeffrey Beck in Indianapolis and discovered that he had nothing to do with the O'Meara crime.
 
 
 8
 Hipp next contacted the First National Bank of Westminster on which the counter check presented to O'Meara--like the check presented to M & L--had been drawn. Employees there informed him that Neal was in the process of investigating a check kiting scheme involving the same Beck bank account he was interested in. Upon realizing that the crimes they were investigating appeared to be related, Hipp and Neal began coordinating their investigations. Indeed, Hipp presented Neal's photographic lineup to Robert Law, the O'Meara car salesman; Law positively identified appellant as the individual who had purchased the car from him--though, again, as we now know, appellant had nothing to do with the O'Meara crime. Neal also submitted a number of documents from both the M & L and the crimes, along with a copy of appellant's driver's license signed by appellant, to a handwriting expert for analysis. The expert told Neal that all of the papers had been signed by the same person.
 
 
 9
 In the end, Neal and Hipp became convinced that Beard had indeed posed as Beck and was responsible for the check kiting operation and the M & L and O'Meara frauds. The officers never made an attempt to contact Beard for themselves, but, instead, proceeded directly to prepare an affidavit and application for an arrest warrant. A county district court judge considered the officers' filings and issued the warrant; appellant was soon thereafter arrested. Five months later, after discovering appellant's utter innocence--after learning that his credentials, like Jeffrey Beck's, had been fraudulently employed by some as-yet unknown perpetrator--all charges against him were dropped.
 
 
 10
 State criminal proceedings over, appellant filed this civil action against Neal and Hipp in federal district court. He argued that the officers had violated his Fourth Amendment right to be free from an unreasonable seizure and, thus, rendered themselves liable in damages under 42 U.S.C. Sec. 1983. Appellant also pressed a state tort claim for malicious prosecution. Neal and Hipp moved for summary judgment, contending that qualified immunity protected them from liability under the Fourth Amendment and that a state statute afforded them similar immunity protection against the state tort claim. The District Court granted summary judgment on both claims and this appeal followed.[2]
 
 II
 
 11
 * When applicable, qualified immunity shields our public agents not only from liability at trial, but also from the very burdens associated with trial. See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). This prophylactic protection is afforded our governmental officials on the grounds "that they can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). In this vein, the question whether qualified immunity protects a particular defendant is most often and most properly passed upon, as here, well in advance of trial, with any denial of qualified immunity amenable to interlocutory appellate review. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1986).
 
 
 12
 The Court in Harlow explained that whether or not qualified immunity properly applies in a given case is a two-fold inquiry. A public officer will only be held liable for his conduct if it can be shown that he trenched upon a plaintiff's clearly established constitutional or statutory right and if a reasonable person in the defendant officer's position would have known his conduct violated that right. 457 U.S. at 818, 102 S.Ct. at 2738. See also Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
 
 
 13
 In applying this two-part test, the trial court observed that the law was clear that an arrest under a warrant is constitutional only if based on probable cause; it then went on to hold that this norm had been violated because Beard's arrest was "based upon the appearance of probable cause, although none actually existed against him. Therefore the first prong of the qualified immunity test has been satisfied." Appellant's Appendix at 211. The trial court, however, still granted summary judgment in favor of defendants because Beard had, on the second part of the immunity test, failed to demonstrate that there was a genuine issue of material fact as to whether a reasonable person in the defendant officers' shoes would have known that the information they furnished in the warrant affidavit did not establish probable cause against Beard.
 
 
 14
 We have problems with the trial court's approach. Clearly established law indicates that an arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested. The District Court here, then, ought not to have held that Beard had demonstrated a violation of his Fourth Amendment rights simply because later events proved him innocent; rather, it ought to have asked whether the warrant issued for his arrest was constitutionally sufficient when sought.
 
 
 15
 With regard to this task, we note that Beard himself does not claim that the warrant or affidavit supporting it were, at the time of issuance, facially inadequate to demonstrate probable cause for his arrest.[3] Rather, he asserts that the affidavit contained false information that, if excised, would have negated probable cause; he argues as well that the document failed to mention material facts in the officers' possession that, if they had been included, would have had the same invalidating effect. To impeach an otherwise valid warrant on the ground that it was issued on specified information that was false and critical to the finding of probable cause requires proof that the affiant seeking the warrant knew that the challenged information was false or that he had a reckless disregard for its truthfulness. Franks v. Delaware, 438 U.S. 154, 155-156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). "Allegations of negligence or innocent mistake are insufficient." Id. at 171, 98 S.Ct. at 2684. Since Franks, this and other courts of appeals have applied its standard to an officers' decision to omit from his warrant affidavit information in his possession that is also critical to the showing of probable cause. See Stewart v. Donges, 915 F.2d 572, 582-583 (10th Cir.1990). See also 2 W. LaFave, Search and Seizure Sec. 4.4 (2nd ed. 1987 & Supp.1993).
 
 
 16
 If the court had addressed itself to the proper Fourth Amendment question, it would have found its resolution of that question would have also dictated its conclusion on the second portion of the qualified immunity test. If, after all, a claimant is able to prove the necessary deliberate falsehood or reckless disregard to impeach a facially valid warrant, the reasonableness inquiry has to be resolved against the defendant since no reasonably competent officer could believe an arrest legal where it was his deliberate or reckless deception that led the magistrate into issuing the warrant. Conversely, if a plaintiff cannot prove a Fourth Amendment violation, there is no need to proceed any further; the case ends in defendant's favor.
 
 
 17
 It is clear from this analysis that the trial court's conclusion that the officers violated appellant's Fourth Amendment rights and still acted reasonably is untenable. To reach such a conclusion under the correct Fourth Amendment standard would require a court to hold the knowing or reckless disregard of the truth in an arrest affidavit--the ultimate act of unreason--reasonable as a matter of law. One might, thus, suggest at this point that a remand is in order so that the trial court might reassess the summary judgment motion with the correct Fourth Amendment standard in mind.
 
 
 18
 We, however, think this unnecessary. On the record before it, after all, the trial court concluded that the officers had acted in an objectively reasonable fashion; such a conclusion necessarily implies that the officers had not violated the Fourth Amendment since reasonable officers do not knowingly or recklessly mislead courts. The District Judge himself recognized as much when he held appellant's state law claim, which itself depended on proof of recklessness, barred by his conclusion on the federal qualified immunity question that the officers had acted in an objectively reasonable fashion. See Part III, infra. Hence, we can confidently say that the District Judge has already quite clearly, if indirectly, decided that the officers were not reckless--let alone liars. Given that fact, no remand is required and we may proceed to review the matter for ourselves, inquiring whether the record reveals a genuine issue of material fact as to whether the officers, in preparing the warrant affidavit, were guilty of deliberate falsehood or reckless disregard for the truth.
 
 
 19
 In undertaking this task, we bear in mind the fact that claims of negligence are insufficient to prove a constitutional violation under Franks v. Delaware. We note, too, that while appellant claims the officers violated his Fourth Amendment rights in several different ways, he never, either in his complaint or briefs before us, directly asserts that the officers knowingly or recklessly prevaricated; the only exception to this rule comes in his discussion of the state law claim, and there his claim of recklessness is made only in the most conclusory fashion. Of course, since this is a summary judgment case, we bear in mind our obligation is to proceed de novo, viewing the factual record and reasonable inferences that might be drawn from it in the light most favorable to Beard.
 
 B
 
 20
 The first and primary piece of evidence Beard points to as proof his Fourth Amendment rights were trenched upon involves Neal's handling of the handwriting samples he submitted for analysis to an expert, Officer Andrew Bradley of the Arapahoe County Sheriff's Office. The samples included a number of documents signed by the unknown perpetrator at O'Meara, M & L, and various Colorado banks where he set up checking accounts; they also included one document bearing Beard's true signature--the Alaskan driver's license. When approaching Bradley, Neal told him, however, not only that the driver's license signature belonged to Beard, but also that the O'Meara and various bank samples were penned by appellant. Indeed, Neal simply asked Bradley to compare the O'Meara, bank, and driver's license signatures--which he stated were "known" to be Beard's--with the M & L signatures--which he stated were of "unknown" origin--in order to ascertain whether Beard penned them as well.
 
 
 21
 As we now know, Neal's representation to Bradley regarding the O'Meara and bank signatures was in error. And, appellant argues, this error--at oral argument counsel labelled it the officers' "worst mistake"--seriously skewed Bradley's analysis, leading him to the erroneous conclusion that "all [the signatures he reviewed] were written by the same person." Bradley's erroneous conclusion, appellant continues, itself skewed the warrant application hearing, leading the court to believe there was substantially more evidence of Beard's involvement in the crimes than actually existed.
 
 
 22
 But, while in hindsight it is beyond cavil that Neal made a mistake in his representations to Bradley, and while the mistake may have had an impact in the outcome of Bradley's analysis and the warrant application hearing, neither of these points bears much relevance to our inquiry. Under the Fourth Amendment our inquiry is focused neither on the existence nor the consequence of Neal's error but on the intention behind it.
 
 
 23
 Turning to this question, for appellant to demonstrate at least recklessness on Neal's part there must exist evidence that the officer " 'in fact entertained serious doubts as to the truth of his' allegations ... and [a] factfinder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations." United States v. Williams, 737 F.2d 594, 602 (7th Cir.1984) (quoting St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985)). There is, however, no direct evidence in the record suggesting that Neal entertained any doubt about the veracity of his statement concerning the signatures when he made it. And, quite unlike the factual records before this court in cases like Bruning v. Pixler, 949 F.2d 352 (10th Cir.1991), or DeLoach v. Bevers, 922 F.2d 618 (10th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991), the facts here present no obvious basis on which to build a case of recklessness by inference.
 
 
 24
 Appellant does proffer the testimony of an expert, retired police officer R. Jon Foster, to the effect that Neal "had no basis for labeling" at least the bank samples as belonging to Beard. See Appellant's Appendix at 124. Looking back from our vantage this conclusion seems unassailable, but it, too, does little to illuminate Neal's intentions while he was conducting his investigation. Like counsel at oral argument, Foster tells us Neal made a mistake, but provides us with no grounds for believing that the mistake was the result of any invidious animus.
 
 
 25
 Foster's statement does appear to intimate that if Neal had only investigated the source of the O'Meara and bank handwriting samples more thoroughly he would have discovered his error. And, perhaps this is true, but it does little to rescue appellant's cause. The failure to investigate a matter fully, to "exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence" rarely suggests a knowing or reckless disregard for the truth. See United States v. Dale, 991 F.2d 819, 844 (D.C.Cir.) (citation omitted), cert. denied, --- U.S. ----, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). See also United States v. Miller, 753 F.2d 1475, 1478 (9th Cir.1985); United States v. Mastroianni, 749 F.2d 900, 909-10 (1st Cir.1984); United States v. Young Buffalo, 591 F.2d 506, 510 (9th Cir.) cert. denied, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979). To the contrary, it is generally considered to betoken negligence "at most." Dale, 991 F.2d at 844.
 
 
 26
 Appellant retorts that, even if Neal's treatment of the handwriting samples is not actionable under the Fourth Amendment, Hipp's misrepresentation in his arrest affidavit of a statement by Darren Carter, manager of the O'Meara dealership, surely must be Carter informed Hipp that Jeffrey Beck had purchased a car from the dealership, yet in his affidavit submitted to the county district judge Hipp substituted Beard's name for Beck's.
 
 
 27
 Hipp's "misrepresentation" here, however, is hardly troublesome. There is no evidence before us even hinting that Hipp's substitution of Beard's name for Beck's was made with an intentional or reckless disregard for the truth; rather, the facts uniformly suggest that Hipp's substitution was made with the honest conviction that the Beard was employing Beck's name as an alias to defraud the O'Meara dealership. All indications are simply that Hipp thought he could help the warrant-issuing judge avoid confusion by piercing through the perpetrator's alias and employing what he thought was his real name.
 
 
 28
 Pressing on, appellant argues that Neal's affidavit is deeply misleading in its discussion of a statement by Ernest Ledvina. During the course of his investigation Neal had asked Ledvina, an M & L employee, whether he could identify the perpetrator of the M & L crime from a photo lineup; Neal marked on his police report, and reported in his affidavit, that Ledvina had indeed "tentative[ly]" identified Beard as the man involved. In a conversation with Foster sometime later, however, Ledvina is said to have stated that he had, over time, become quite sure that Beard was not the perpetrator of the M & L crime. When Foster asked Ledvina whether or not he had thought Beard was the perpetrator at the time he viewed the lineup, Ledvina's responses apparently ranged from denying that he ever picked Beard's photograph out of the lineup to failing altogether to recall what he had told Neal. Appellees' Brief at 11.[4] Foster urged Ledvina to sign an affidavit to the effect that Beard had nothing to do with the M & L crime but Ledvina demurred.
 
 
 29
 Even putting aside the obvious potential hearsay problems with permitting appellant to rely upon Foster's representations of Ledvina's remarks to Neal in order to establish a constitutional violation, we see no serious indication of any improper state of mind on Neal's part. The officer's report and affidavit did not represent that Ledvina positively identified Beard; it noted only a "tentative" identification. Ledvina himself, moreover, appears to be unsure exactly what he told Neal at the time. Confusion may attend what transpired at the identification session, but out of this confusion comes no basis for believing that Neal's characterization of Ledvina's comments were either intentionally or recklessly misleading--or, for that matter, even inaccurate.
 
 
 30
 All of appellant's remaining Fourth Amendment arguments, of which we will only mention two here in passing, are likewise unconvincing. Appellant charges, for instance, that Hipp's affidavit was materially incomplete because it failed to mention that Robert Law, the O'Meara salesman who positively identified him out of a photo lineup as the perpetrator of the O'Meara fraud, had a criminal record. But, the uncontroverted evidence indicates that Hipp never knew of these convictions, see Appellees' Brief at 12 and Appellant's Reply Brief at 14; consequently and once again, appellant's claim on this score amounts at best to a failure to investigate thoroughly and, thus, one for negligence. As with Law's criminal record, so too with Beard's flight records. Appellant argues that the officers should have checked his flight records on the days when the M & L and O'Meara crimes occurred before they arrested him; if they had, he submits, they would have discovered he was not in Colorado at the time. This may be so, but no Fourth Amendment violation accrues simply because an officer failed to delve into the case before him as fully as we, viewing the matter at a comfortable remove, might have hoped.
 
 
 31
 * * *
 
 
 32
 Having marched through the particulars of appellant's arguments, it is worth stepping back a moment to take a realistic view of the whole picture before us. Doing so reveals just how difficult it is to infer recklessness on these facts. Neal and Hipp, after all, were after someone who had surely broken the law, and the officers had a great many indications that Beard was the true culprit--ranging from finding his name on several key bank accounts to the positive identification made by Law. Indeed, the perpetrator had crafted his crimes with the very intention of leading investigators to believe falsely that Beard was their man. It is worth recalling, too, that when his flight credentials were stolen even Beard himself foresaw the possibility that someone might use them as part of a crime and that the police might well come to suspect his involvement. See Appellant's Opening Brief at 3. And, of course, the fact that two officers, working together but coming from separate police organizations, came to the same erroneous conclusion regarding Beard's involvement does tend to undercut any suggestion that his arrest was the product of reckless police work.
 
 III
 
 33
 Failing in his constitutional claim, appellant nonetheless attempts to proceed against Neal and Hipp with a diversity-based state tort claim for malicious prosecution. Appellees respond by invoking a state statute which, they argue, immunizes them from any such action; the statute provides that "a public employee shall be immune from liability in any claim for injury, ... unless the act or omission causing such injury was willful or wanton." Colo.Rev.Stat.Ann. Sec. 24-10-118(2) (Bradford 1988).
 
 
 34
 When considering these same arguments on summary judgment, the District Court noted that Colorado's law equates "willful and wanton" conduct with at least recklessness, see C.J.I.Civ.3d 9:32; it then held a finding of recklessness to be effectively foreclosed by its decision in the Sec. 1983 context that the officers had behaved in an objectively reasonable fashion. Believing that a showing of recklessness is indeed required under the Colorado immunity formulation, and having just discussed why we see no evidence of such behavior in this case, we, too, think the officers immune from any state tort claim and affirm the District Court on this score.
 
 IV
 
 35
 Given, in Harlow 's parlance, appellant's inability to sustain an inference that the officers acted knowingly or recklessly to mislead the warrant-issuing judge, we hold summary judgment in favor of appellees on his Sec. 1983 claim appropriate. We hold, too, the dismissal of the state tort claim entirely proper.[5] Accordingly, the District Court's judgment is
 
 
 36
 Affirmed.
 
 
 
 *
 The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. Sec. 294(a)
 
 
 [1]
 We refer to a single unknown perpetrator for simplicity's sake; there may, of course, have been more than one individual involved
 
 
 [2]
 Appellant did file a number of other claims against Neal, Hipp, and others; none of these are now before us, having been settled or resolved at earlier stages in this litigation
 
 
 [3]
 Although officers in making an arrest are normally safe in relying on a warrant issued by a judge, the trial judge in a criminal case or a Sec. 1983 case such as this one is entitled to recognize that the warrant affidavit was facially inadequate. Malley v. Briggs, 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). See also United States v. Leon, 468 U.S. 897, 903, 104 S.Ct. 3405, 3410, 82 L.Ed.2d 677 (1984). In that event, the officer's immunity will depend on whether any competent officer would have known that the affidavit was insufficient
 
 
 [4]
 Foster did sign two affidavits indicating that Ledvina "told me that the person who defrauded him was not in the photo lineup and that he specifically told this to [Neal]." Appellant's Appendix at 28, 125
 
 
 [5]
 Having disposed of appellant's claims against Neal and Hipp as we have, there is, of course, no need to consider appellant's argument that the cities of Northglenn and Westminster ought to indemnify the officers