PUBLISH

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**July 6, 2020**

**TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

ANTHONY KAPINSKI,

        Plaintiff - Appellant,

v.

CITY OF ALBUQUERQUE; TERRA
JUAREZ,

        Defendants - Appellees.

No. 19-2149

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:18-CV-00716-SCY-GJF)**

---

_Submitted on the Briefs_

Andrew B. Indahl, Altura Law Firm LLC, Albuquerque, New Mexico, for
Appellant.

Kristin J. Dalton, Managing Assistant City Attorney, City of Albuquerque Legal
Department, Albuquerque, New Mexico, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **CARSON**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

After shooting and killing two men, Anthony Kapinski was arrested and prosecuted for murder. But at trial, the jury found him not guilty on the basis of self-defense. Trial evidence included video surveillance footage of the incident. Kapinski then brought civil rights claims under 42 U.S.C. § 1983 against Detective Terra Juarez and the City of Albuquerque, alleging constitutional violations stemming from Detective Juarez's failure to mention the video surveillance footage in her warrant affidavit for Kapinski's arrest. He argued that if the court issuing the arrest warrant had been made aware of the video footage, it would not have found probable cause supporting the warrant.

Detective Juarez moved for summary judgment on qualified immunity grounds, and the district court granted her motion. The court held Kapinski failed to show a constitutional violation because the video footage would not have negated probable cause for his arrest, and, even if Detective Juarez's omission ran afoul of the Fourth Amendment, she was nonetheless entitled to summary judgment because the law on this issue was not clearly established.

We agree Kapinski fails to show a clearly established constitutional violation and therefore AFFIRM.

## I. Background

On June 2, 2017, Anthony Kapinski shot and killed Paul Francia and Jordan Mucher amidst a late-night altercation in a crowded church parking lot in

Albuquerque, New Mexico. Two of the church's surveillance cameras captured the incident on video. Immediately after the shooting, Kapinski fled. The Albuquerque Police Department reached the scene shortly thereafter.

Detective Terra Juarez was one of the first officers to arrive. She began her investigation by conducting and recording interviews with several eyewitnesses:

- Manuel Castro reported that he "heard what sounded like a vehicle backfire." App. at 39. When he looked in the direction of the sound, he noticed a male pointing a gun at another male. He saw the male with the gun shoot twice and then watched as the other man fell to the ground. The male with the gun then fled.

- Tyler Schwebke, a friend of both victims, reported that he had arrived at the parking lot with Francia and Mucher. He stated that "[a]ll three were upset with [Kapinski] because he had stolen vehicle parts from them in the past." *Id.* at 40. Although Schwebke did not personally see the shooting, he reported that he heard gunshots and then noticed Kapinski leaving the parking lot, at which point he realized Francia and Mucher had been shot.

- Mariah Molt reported that she was dating one of the victims, Francia. She said that she saw Francia and another male talking with

-3-

Kapinski near Kapinski's vehicle. She heard Francia say "you know

who the f**k I am" to Kapinski and then punch him. *Id.* at 40.

According to Molt, Kapinski fell back into the driver's seat, and then

another male that she did not know began fighting with Francia. At

this time, Mucher got involved in the fight to assist Francia. Then

Molt said she heard gunshots and saw muzzle flashes coming "from

inside the car where [Kapinski] was at." *Id.*

By the time Detective Juarez completed the eyewitness interviews, it was

past 2:00 A.M. in the morning of the next day. Sometime between 3:00 A.M. and

3:57 A.M., Detective Juarez obtained and viewed the church's surveillance tapes.[1]

The videos show,[2] in mute black and white footage, Kapinski standing near the

open front driver's side door to his vehicle. He is talking with an acquaintance,

whom Detective Juarez later identifies as "Aiden." *Id*. at 59  60. A group of

people, including Francia and Mucher, approach Kapinski. Some in the group

---

[1] Footage from both surveillance cameras is in the appendix on appeal and has been viewed by the court. Because the videos capture the same scene, we do not differentiate between them here, but draw on both.

[2] We relay here only what is indisputably shown by the videos, and therefore necessary to take as a matter of fact. *Scott v. Harris*, 550 U.S. 372, 378  81 (2007) (holding that where a video depicts facts in such a clear manner so that "no reasonable jury" could have believed an alternative story, then the court must "view[] the facts in the light depicted by the videotape"). We address below Kapinski's argument that the video footage should be construed as depicting *more* than that.

-4-

hang back several feet away from Francia and Kapinski as they watch the confrontation.

The critical events unfold over a matter of seconds. Francia walks up close to Kapinski, talking to him from a couple feet away. Aiden remains standing right next to Kapinski and Francia. Francia punches Kapinski in the face, apparently without provocation, and continues to throw several punches. Kapinski falls back into the driver's seat of the car. He remains out of view of the cameras, but Francia continues to hit Kapinski.

Aiden then moves toward Francia. As Aiden begins hitting Francia, Mucher intervenes by jumping on Aiden's back. Mucher and Aiden tumble together away from Francia, ending up entangled a few feet from the driver's door. They continue to struggle with each other in this spot. Up until Mucher is shot, neither he nor Aiden leaves his feet. Another member of Francia and Mucher's group briefly jumps in to hit Aiden a few times, but then departs.

With Mucher and Aiden preoccupied with each other, Francia   who has been separated from Kapinski by Aiden's interference   begins to back away from the car. It is not evident whether he has been shot at this point. As Francia is slowly backing away, Kapinski stands up out of the driver's seat. Kapinski holds his arms extended in Francia's direction, consistent with aiming a gun at Francia.

Francia then hunches over, clutches at his chest, and begins to stumble, eventually falling face down.

Kapinski then drops his arms and ducks back into the car, out of sight. Mucher and Aiden continue to grapple near the driver's door. A light appendage emerges from the car, consistent with Kapinski sticking his arm out over the driver's side door. Then Mucher falls to the ground. Aiden quickly backs away from him, and Kapinski closes the car door and drives away.

By the time Detective Juarez finished reviewing the video footage, it was after 3:57 A.M. She next made contact with the families of the victims, and then returned to her office. There, she was able to access certain databases and verify information regarding Kapinski, including his name, known aliases, and his vehicle's registration details. Only after confirming these, did Detective Juarez draft an initial arrest warrant affidavit for Kapinski's arrest for murder. The initial warrant was approved by an assistant district attorney and then approved by a judge.[3]

In the affidavit accompanying the warrant application, Detective Juarez described the crime scene generally and relayed information gleaned from the

---

[3] Sometime after 4:36 P.M. on the same day, Detective Juarez realized that the initial arrest warrant erroneously listed a single count of murder, so she drafted an amended arrest warrant to include two counts of murder, which was similarly approved.

eyewitness interviews. This included certain information consistent with Kapinski acting in self-defense or defense of others. For example, the affidavit states that Molt saw Francia approach Kapinski, curse at him, and punch him. It further details how an "unknown male," presumably Aiden, began fighting with Francia, and that Mucher "jumped into the fight to help [Francia]." App. at 40.

But the affidavit omits any mention of the church's security cameras. It does not state that Detective Juarez obtained or viewed the footage, nor does it contain any information indicative of self-defense from the security cameras not otherwise conveyed by the eyewitness statements.

Kapinski was arrested pursuant to the warrant and stood trial for Francia and Mucher's murder. In the course of these proceedings, the jury viewed the video surveillance footage and ultimately acquitted Kapinski on the basis of self-defense.

Kapinski subsequently brought the instant action under 42 U.S.C. § 1983 against Detective Juarez and the City of Albuquerque alleging (1) false arrest and imprisonment, and (2) malicious prosecution. He also brought a state law claim for negligent training and supervision under the New Mexico Tort Claims Act against the City. All of Kapinski's federal claims depend on his argument that Detective Juarez unconstitutionally omitted exculpatory evidence from her warrant affidavit   namely the video footage, which Kapinski contends establishes

he acted in self-defense.  In response, Detective Juarez moved for summary judgment on the basis of qualified immunity, arguing that omitting the video footage did not transgress any clearly established law.  The City of Albuquerque also moved for summary judgment on Kapinski's state law claim.

The district court granted Detective Juarez's motion.  It held Kapinski had neither shown a constitutional violation, nor, assuming Detective Juarez's conduct violated the Fourth Amendment, that such a violation was clearly established at the time.  The district court declined to exercise jurisdiction over the state law claim against the City of Albuquerque.

## II.  Analysis

Kapinski contends the district court erred in granting qualified immunity, arguing Detective Juarez's omission of the video evidence sufficiently tainted the arrest warrant to negate probable cause, making the arrest unconstitutional.

We review the grant of summary judgment on qualified immunity grounds de novo.  *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015); *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1179 (10th Cir. 2009).  Generally, summary judgment is warranted where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "When applying this standard, we view the evidence and draw reasonable

inferences therefrom in the light most favorable to the nonmoving party." *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011).

But our "review of summary judgment orders in the qualified immunity context differs from that applicable to . . . other summary judgment decisions." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Qualified immunity is intended to give officials "breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). It creates a framework intended to provide defendants with an ability to end suits early in litigation so that they, as public employees, may continue to go about their official business without the persistent threat of defending themselves in court. *See Saucier v. Katz*, 533 U.S. 194, 200  01 (2001) (noting qualified immunity provides "immunity from suit rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial").

Thus, where a defendant asserts qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment." *Id.*

*A. Constitutional Violation*

Kapinski asserts a violation of his Fourth Amendment rights under the doctrine established by *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that affiants seeking arrest warrants violate the constitution when they knowingly, or with reckless disregard for the truth, include false statements in a supporting affidavit or omit information which, if included, would prevent the warrant from lawfully issuing. *Id.* at 171; *see also Puller*, 781 F.3d at 1197. Kapinski does not allege Detective Juarez acted knowingly or deliberately. Nor does he claim her affidavit contained any false statements. Instead, he rests his constitutional claim on the allegation that Detective Juarez recklessly omitted exculpatory information from her affidavit which, if included, would have vitiated probable cause. Aplt. Br. at 5 (describing his claim as involving "the reckless omission of critical exculpatory facts from a warrant affidavit"); *Id.* at 20 ("Kapinski has brought an omission of critical information claim.").

Such a *Franks* claim has two components. First, Kapinski must show the omitted information was "material" in that its inclusion would have vitiated probable cause for issuing the warrant. *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015); *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (noting plaintiffs bear the burden of establishing a *Franks* violation in the § 1983 context). Second, he must demonstrate Detective Juarez acted with the requisite

mental state     recklessness    in omitting the information.  *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994).  Kapinski fails to meet his burden with respect to either element.

### *1. Materiality*

In addressing the materiality of the omitted information, we look to see whether a warrant would issue in a "but-for world where the attesting officer faithfully represented the facts."  *Herrera*, 782 F.3d at 575.  We make this assessment by "(1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes [or negates] probable cause for the warrant."  *Puller*, 781 F.3d at 1197.

Because Kapinski does not allege any explicit misrepresentations, we begin with the second *Puller* step    adding the omitted information into the warrant affidavit.  This raises the question of what precisely to include.  Kapinski urges us to adopt his *interpretation* of the video footage as the omitted "facts."  Specifically, he argues we must construe the video footage as showing (1) that Francia never stopped trying to attack Kapinski and was still actively attacking him when Kapinski shot him; (2) that Mucher was holding Aiden in a "choke hold" to prevent him from intervening further to protect Kapinski; (3) that Mucher continued to hold Aiden, approached Kapinski aggressively, and pushed

-11-

the car door forcefully into Kapinski's body, knocking him back down to the car; and (4) that Kapinski shot Mucher after falling back down into the car because Mucher had attacked him and because he had a reasonable basis to fear more attacks from Mucher. Aplt. Br. at 10.

Kapinski contends that this characterization of the video is justified because under the summary judgment standard we must view the facts in the light most favorable to Kapinski and these statements are not "blatantly contradicted by the record." *Id.* at 11. Thus, he argues we must assume Detective Juarez "knew" these facts and omitted them from the warrant affidavit. *Id.* at 29 ("Plaintiff contends . . . that a jury could find that Detective Juarez knew those facts from having undisputedly watched the surveillance video [and] that she omitted those facts from her warrant affidavit."). In essence, Kapinski's argument is that because a reasonable juror could view the video, accept Kapinski's characterization of the facts, and therefore conclude probable cause is lacking, the materiality determination must be a question of fact for a jury.

We disagree. The Supreme Court has already rejected this approach in the context of civil rights claims reliant on probable cause determinations. For example, in *Hunter v. Bryant*, the Court considered whether a *Bivens* suit alleging federal officers arrested plaintiff without probable cause in violation of his Fourth Amendment rights could survive the officers' summary judgment motion seeking

-12-

qualified immunity. 502 U.S. 224 (1991). The Ninth Circuit had held that the

officers were not entitled to summary judgment, stating, "whether a reasonable

officer could have believed he had probable cause is a question for the trier of

fact, and summary judgment . . . is proper only if there is only one reasonable

conclusion a jury could reach." *See Bryant v. U.S. Treasury Dep't*, 903 F.2d 717,

721 (9th Cir. 1990). The Supreme Court rejected this rationale as inconsistent

with qualified immunity principles designed to protect officers who make

reasonable but mistaken probable cause determinations from the burden of going

to trial. *Hunter*, 502 U.S. at 227 (emphasizing the "importance of resolving

immunity questions at the earliest possible stage").

The Court clarified that the Ninth Circuit's statement    which mirrors

Kapinski's argument here    was flawed for two reasons: (1) "it routinely places

the question of immunity in the hands of the jury"; and (2) "the court should ask

whether the agents acted reasonably under settled law in the circumstances, not

whether another reasonable, or more reasonable, interpretation of the events can

be constructed . . . years after the fact." *Id.* at 228. Consistent with *Hunter*, our

precedents confirm that where a § 1983 claim premises liability on an alleged

*Franks* violation, courts may decide the probable cause question at the summary

judgment stage. *See Puller*, 781 F.3d at 1197  98; *Stonecipher*, 759 F.3d at 1142.

And indeed, they may do so without first characterizing ambiguous omitted

-13-

material in plaintiff's favor.  *See Puller*, 781 F.3d at 1197 98 (holding probable cause existed without first characterizing an omitted "ambiguous statement" in plaintiff's favor).

Thus, we decline Kapinski's invitation to treat his characterization of the video as the omitted material.  Instead, the more appropriate approach is to simply assume that Detective Juarez included the video footage   with all of its uncertainties and ambiguities   as an attachment to the warrant affidavit.

Viewing the amended warrant application in this way, we conclude that it supports probable cause for Kapinski's arrest and prosecution.  Probable cause is not a precise quantum of evidence   it does not, for example, require the suspect to be more likely guilty than not.  *Stonecipher*, 759 F.3d at 1141.  Instead, the question is whether "a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011).  The fact that "the suspect is later acquitted of the offense for which he is arrested is irrelevant" to this inquiry.  *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

Here, the eyewitness reports and video footage provide a substantial probability that Kapinski murdered Mucher and Francia.  With respect to Francia, Kapinski is correct that the evidence shows Kapinski was not the first aggressor.  The evidence depicts Francia initiating the interaction, combatively addressing

-14-

Kapinski, and throwing the first punch. Critically, however, the video footage shows that after Kapinski falls back into the driver's seat, Francia begins backing away from the car. We are unable to know precisely when Kapinski shot Francia, but Kapinski does not reappear and raise his arms towards Francia in a manner consistent with shooting him until *after* Francia is already moving away from Kapinski and the vehicle.

Although a jury could, reasonably, conclude that Kapinski was acting in self-defense, we find the evidence also establishes probable cause. That is, there is a substantial probability that, at the time Kapinski shot Francia, there was no "appearance of immediate danger of death or great bodily harm" to Kapinski. N.M.R.A., CR UJI 14-5171 (defining elements of self-defense).[4] Moreover, a substantial probability existed that Kapinski lacked the requisite fear at this time. *See id.* (stating that to justify homicide the defendant must have been "put in fear by the apparent danger of immediate death or great bodily harm" and acted out of that fear). Thus, an objective viewing of the video does not negate probable cause.

---

[4] New Mexico's Uniform Jury Instructions define "great bodily harm" as "an injury to a person which [creates a high probability of death], [or] [results in serious disfigurement] [or] [results in loss of any member or organ of the body] [or] [results in permanent or prolonged impairment of the use of any member or organ of the body]." N.M.R.A., CR UJI 14-131.

The evidence with respect to Mucher is even clearer. Kapinski argues that immediately before being shot, Mucher was holding Aiden in a "choke hold" while he continued to "approach[] [Kapinski] aggressively" and "attack" Kapinski by pushing the car door forcefully into him. Aplt. Br. at 10. Similar to the district court, we find this summary supported only tenuously, if at all, by the video footage. The video does show Mucher jump on Aiden's back, likely wrapping his arm around Aiden's neck. But then the two shift, and both remain on their feet, struggling with each other. We agree with the district court that "the video definitively does not show [Mucher] choking a passive and defenseless Aiden." App. at 112.

Nor does it show Mucher attacking Kapinski by shoving the door into him. Due to the lack of contrast between Mucher's shirt, the pavement, and the car door, there is no indication that Mucher touched the door or shoved it into Kapinski. Instead, the video shows Kapinski shooting Mucher while he was struggling in close quarters with Aiden, without providing much detail on the intensity of the fight or whether Mucher was aggressive at all towards Kapinski. This establishes probable cause that Kapinski murdered Mucher, as it is far from evident from the video footage that either Aiden or Kapinski faced "immediate danger of death or great bodily harm" from Mucher or acted out of any such fear. *See* N.M.R.A., CR UJI 14-5171, 14-5172.

In light of these facts and the permissible nature of the probable cause inquiry, we conclude that the amended warrant supported probable cause, rendering the omitted video footage immaterial.

## 2. Recklessness

Kapinski similarly fails to carry his burden with respect to Detective Juarez's state of mind. *See Franks*, 438 U.S. at 171; *Stonecipher*, 759 F.3d at 1142 (holding the plaintiff must make "a substantial showing of . . . reckless disregard for truth").

To establish recklessness, "there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations." *Stonecipher*, 759 F.3d at 1142. A reviewing judge may infer recklessness from "circumstances evincing obvious reasons to doubt the veracity of the allegations." *Beard*, 24 F.3d at 116. But this is not a mandatory or automatic inference. *Id.*; *see also United States v. Clark*, 935 F.3d 558, 566 (7th Cir. 2019) (holding courts need not infer recklessness "from the fact that an officer omitted known and substantial adverse information from a search warrant affidavit").

Here the record lacks direct evidence of Detective Juarez's recklessness and fails to support any such inference. Kapinski's sole contention with respect to Detective Juarez's culpable mental state is that the facts here speak for themselves. Aplt. Reply at 20 ("[T]he nature of the facts themselves is prima

facie evidence of reckless disregard."). As we have recognized in other cases, the egregiousness of an omission may, in some circumstances, lead to an inference of recklessness. *See DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990) ("Recklessness may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause."). But here, Kapinski's conclusory argument is insufficient. *See Beard*, 24 F.3d at 116 (rejecting an inference of recklessness where "the facts . . . present no obvious basis on which to build a case of recklessness by inference").

Just as in *Beard*, the facts present no basis to conclude Detective Juarez acted recklessly in omitting the video footage. Indeed, the fact that Detective Juarez included evidence militating *in favor* of self-defense in the affidavit negates any such inference. The affidavit recounts Molt's statement describing how Francia sought out Kapinski, cursed at him aggressively, and threw the first punch in the altercation. Such inclusions are inconsistent with the premise that Detective Juarez was recklessly indifferent to evidence suggesting Kapinski acted in self-defense.

Nor can Kapinski establish recklessness by arguing that "any reasonable person would have known [the surveillance footage] was the kind of thing the judge would wish to know." Aplt. Br. at 21. Critically, the video footage does not materially differ from the eyewitness accounts included in the affidavit.

Having relayed that information, Detective Juarez put the reviewing assistant district attorney and judge on notice that Kapinski may not have been the first aggressor in the encounter. While the video footage could be portrayed as representing additional evidence of self-defense, such a reading is far from the sole interpretation and in many ways the less natural one. In short, the video footage fails to constitute the type of self-evidently "clearly critical" information, omission of which justifies an inference of recklessness. *Compare DeLoach*, 922 F.2d at 622 23 (finding sufficient evidence to support jury's recklessness determination where officer included numerous affirmative misstatements that contradicted interview transcripts and notes, omitted exculpatory expert medical testimony, and made statements indicative of intentional or reckless conduct on cross-examination at trial).

Perhaps Detective Juarez's affidavit would have been more complete had she, out of an abundance of caution, included the video footage in her affidavit. But not every failure to perform police investigations in a perfectly thorough manner renders them constitutionally infirm. *See Beard*, 24 F.3d at 116 ("[F]ailure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth."). Here, given the largely consistent nature of the video footage with the eyewitness accounts and

the fact that Detective Juarez viewed the footage in the early-morning hours of an all-night murder investigation, we are unable to conclude that omitting the video footage constitutes anything beyond mere negligence. *Id.* (rejecting inference of recklessness where the record provided "no grounds for believing that the mistake was the result of any invidious animus"); *see also Puller*, 781 F.3d at 1197 (rejecting *Franks* claim where there was nothing but "conclusory allegations" that the officer "intentionally or recklessly omitted" the information at issue); *Taylor v. Meacham*, 82 F.3d 1556, 1560  63 (10th Cir. 1996) (concluding that an officer did not violate the Fourth Amendment because the plaintiff failed to provide any evidence showing the officer omitted any facts knowingly or with reckless disregard for the truth).[5]

We thus reject Kapinski's alleged constitutional claim. Because he fails to show the materiality of the omitted video footage and that Detective Juarez acted out of a reckless disregard for the truth, Kapinski cannot establish a Fourth Amendment infraction under *Franks*.

*B. Clearly Established*

Kapinski also fails to show his alleged Fourth Amendment violation was

---

[5]  Although not relevant to our ultimate conclusion, we also note that the government proceeded to obtain an indictment and prosecute the case on the same basis as the arrest affidavit   murder   despite the presence of the video footage.

clearly established.[6] A constitutional right is clearly established when "'the contours of [the] right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). As the Supreme Court often reiterates, courts must not define what is clearly established at a high level of generality. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (noting that "specificity is especially important in the Fourth Amendment context"). Although plaintiffs need not cite a case with identical facts to demonstrate a clearly established right, existing precedent "must [] place[] the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

Kapinski argues the clearly established prong is satisfied by alleging "critical information" was omitted from Detective Juarez's affidavit. Aplt. Br. at 20. Under this theory, the criticality of the omitted information need not be proven by reference to precedent; it is enough that the alleged omissions are the

---

[6] Sometimes we assess this prong of the qualified immunity inquiry by asking whether there was "arguable probable cause" for the challenged conduct. *See Stonecipher*, 759 F.3d at 1141; *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher*, 759 F.3d at 1141. Arguable probable cause is sufficient to avoid liability because "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227. We hold arguable probable cause exists here for the same reasons probable exists, as outlined above.

type of information that "any reasonable person would have known . . . was the kind of thing the judge would wish to know." *Id.* at 25 (quoting *Stonecipher*, 759 F.3d at 1142). But this standard finds no support in our precedent, and its application fails to comport with the notion that "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308.

As we said in *Harte v. Board of Commissioners*, alleged reckless omissions in warrant affidavits require courts to examine existing law with a high degree of specificity. 864 F.3d 1154, 1202 (10th Cir. 2017) (noting specificity required because "law enforcement officers can have difficulty determining 'how the relevant legal doctrine . . . will apply to the factual situation the officer confronts'" (quoting *Mullenix*, 136 S. Ct. at 308)).[7] And, importantly, a critical distinction exists between deliberate falsehoods and reckless omissions when assessing whether a putative *Franks* violation is clearly established. *See id.* at 1202. Where *intentional misstatements* are concerned, our precedent clearly establishes that lying in a warrant affidavit is unconstitutional. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298  99 (10th Cir. 2004). Because there is "little ambiguity as to what kind of conduct constitutes lying," this general principle suffices to place the question beyond constitutional debate and put reasonable law

---

[7] *Harte* was decided by a three-judge panel with each judge writing separately, but the panel agreed on the applicable legal framework.

enforcement officers on notice, even in the absence of factually analogous precedent. *Harte*, 864 F.3d at 1202.

But where *reckless omissions* are alleged, significant ambiguity exists around how the law applies to a particular factual situation. *See Saucier*, 533 U.S. at 205 ("It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation."). That is, "when determining whether an officer has recklessly disregarded the truth in a warrant application, the result depends very much on the facts of each case." *Harte*, 864 F.3d at 1202 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)). Thus, similar to excessive force claims, the context-dependent nature of Kapinski's reckless omission claim necessitates a factually analogous precedent to overcome the clearly established prong of qualified immunity. *Id.* ("[Plaintiffs] must therefore identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.").

Kapinski fails to put forward any such precedent. *Harte* provides no support because there we held that only a theory of liability premised on an intentional misrepresentation in a warrant affidavit was clearly established. *Id.* at 1158 (noting that on remand the plaintiffs' *Franks* claim was "limited to their theory that one or more of the . . . defendants lied" in the warrant affidavit).

And *Stonecipher* does no more to support Kapinski's claim. Not only is that case factually distinguishable, but there we found no violation of clearly established law. In *Stonecipher*, federal agents investigating the Stoneciphers for illegally dealing guns and explosives learned that the husband had pleaded guilty to domestic assault in Missouri. 759 F.3d at 1139. Believing that this constituted a conviction under Missouri law, which in turn would have made it a crime for the husband to possess and sell firearms under 18 U.S.C. § 922(g)(9), the officers filed a search-warrant affidavit. But, as it turned out, the husband had received only a suspended sentence for the domestic assault, which did not constitute a conviction under Missouri law. The officers omitted the suspended sentence information from the warrant affidavit, giving rise to the subsequent *Bivens* suit based on a reckless omission theory. We held the agents were entitled to qualified immunity because they acted objectively reasonably under arguable probable cause. This ruling renders *Stonecipher* of little use to Kapinski's theory that Detective Juarez's omissions violated clearly established law.

Kapinski also points to *DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990). There, in a post-trial proceeding, we affirmed the jury verdict against a police officer for, among other things, submitting an "intentionally false and misleading affidavit" that led to the arrest of a child's caretaker on murder charges after the child's death. *Id.* at 619. Unlike here, the warrant affidavit in *DeLoach*

-24-

contained multiple false statements that exaggerated the caretaker's guilt, which were directly contradicted by the officer's investigatory notes and the transcripts of interviews. In addition to these misstatements, the officer omitted expert medical opinions exonerating the caretaker. *Id.* at 622. After considering both the material misstatements and the omitted information, we held the district court was justified in submitting the question of probable cause to the jury.

*DeLoach*, at most, stands for the proposition that where inculpatory misstatements are included and exculpatory expert medical opinion are excluded from a warrant affidavit, officers may not be entitled to immunity. But *DeLoach* fails to put officers in Detective Juarez's position on notice that all equivocally exculpatory video footage must be included in a warrant affidavit. Indeed, we reiterated in that case that "not all evidence known to the officer need be included in every affidavit used to secure an arrest warrant." *Id.* at 622 23. Thus, to expand *DeLoach* to capture this more general principle would run counter to the specificity required and the purposes of qualified immunity.

Finally, *Pierce* similarly fails to put a reasonable officer in Detective Juarez's position on notice of the allegedly unconstitutional nature of her conduct. 359 F.3d 1279 (10th Cir. 2004). In *Pierce*, we considered an appeal by defendants, a state prosecutor and forensic analyst, from the district court's denial of their motion to dismiss Pierce's § 1983 claims. The gravamen of Pierce's

complaint concerned the fabrication of inculpatory evidence and the disregarding of exculpatory evidence specifically concerning forensic test results for hair and blood samples which resulted in Pierce's arrest and imprisonment for a rape he did not commit.[8]

In considering whether his alleged constitutional violation was clearly established, we held "[n]o one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986." *Id.* at 1298. Although Pierce's allegations centered on the affirmative falsification of evidence, the court considered how the same principles applied to reckless omissions in warrant affidavits, accepting that they did. *Id. Pierce* thus puts the constitutionality of certain conduct beyond debate, but it is limited to its factual context. For example, under *Pierce*, an officer will lack immunity for omitting forensic hair and blood tests from an arrest warrant where those tests exculpate the subject of the warrant.

But applied here, *Pierce* is too factually distinct to put reasonable officers in Detective Juarez's position on notice. *Pierce* does not suggest that ambiguous evidence must be included if one interpretation of that evidence may cast doubt on a suspect's guilt. To the contrary, *Pierce* concerned the affirmative falsification of forensic hair analysis and the disregarding of blood analysis

---

[8] After spending fifteen years in prison, Pierce's conviction was vacated on the basis of DNA evidence.

which, if considered, would have eliminated Pierce from suspicion. *Id.* at 1282. The video evidence at issue here presents no analogue to this cocktail of deliberate fabrication and manipulation. Accordingly, we have little trouble concluding a reasonable officer in Detective Juarez's position would not take *Pierce* as guiding or clarifying with respect to whether to include the footage in her warrant affidavit. That case thus fails to provide "fair notice that the described conduct was unconstitutional." *Id.* at 1298.

Having put forward no precedent establishing that reasonable officers in Detective Juarez's position would have fair notice their conduct violated the Constitution, Kapinski fails to demonstrate the clearly established nature of his alleged infraction. Detective Juarez is accordingly entitled to immunity.

## III. Conclusion

For the reasons stated above, we AFFIRM the district court's grant of summary judgment to Detective Juarez and the City of Albuquerque.